# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

KEVIN LAROSE,         )
                      )
     Plaintiff,         )
                      )
     vs.             )     **Case number 1:14cv0123 TCM**
                      )
CAROLYN W. COLVIN, Acting    )
Commissioner of Social Security,   )
                      )
     Defendant.        )

## MEMORANDUM AND ORDER

This 42 U.S.C. §§ 405(g) and 1383(c)(3) action for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the applications of Kevin LaRose (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

## Procedural History

Plaintiff applied for DIB and SSI in August 2010, alleging he was disabled as of January 31, 1999, by depression, panic disorder, mood disorder, schizophrenia, bipolar disorder, learning disabilities, and back pain. (R.[1] at 133-43, 170.) His applications were

---

[1] References to "R." are to the administrative record filed by the Acting Commissioner with her answer.

denied initially and after a hearing held in August 2012 before Administrative Law Judge (ALJ) Stephen M. Hanekamp. (Id. at 11-26, 31-72.) The Appeals Council denied Plaintiff's request for review, thereby adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-4.)

## Testimony Before the ALJ

Plaintiff, appearing with a non-attorney representative, and Thomas D. Upton, Ph.D., C.R.C.,[2] testified at the administrative hearing.

Plaintiff, then thirty-nine years old, testified he left school after the tenth grade, has a seventeen-year old daughter, and has been living with his girlfriend – a waitress – for the past twenty years. (Id. at 36-37, 48.) He has no income of his own and receives Medicaid. (Id. at 37.) He is 6 feet 4 inches tall and weighs 265 pounds. (Id. at 38.) He has put on weight because of the medication he is taking. (Id.) He was in special education classes in school. (Id. at 45.) His girlfriend helped him complete the DIB and SSI application forms because he could not understand the questions. (Id. at 45-46.) Plaintiff does not have a General Equivalency Degree (GED). (Id. at 36.)

Plaintiff last worked in 2006. (Id. at 37.) He quit the job, which did not last long, because he could not be around people. (Id.) He has anxiety attacks that can last for a day or two or longer. (Id. at 39.) He then has to lie down and try to relax. (Id.) Also, he hears indecipherable voices at least three or four times a week at unpredictable times. (Id. at 41-42.)

---

[2]Certified Rehabilitation Counselor.

Plaintiff does not have a driver's license, having lost it in his 20s due to a driving while intoxicated charge; he does not have the money to get it back.  (Id. at 39-40, 49.)  He leaves the house a couple of times a week to go to the doctor or the pharmacy.  (Id. at 40.)  He does not go to the grocery store.  (Id.)  He tries to do things around the house, e.g., cooking and washing dishes.  (Id. at 43.)  He mows his grass when he can.  (Id. at 49.)  If his back bothers him, he has to lie down for an hour or two.  (Id. at 43.)  This happens two or three times a week.  (Id. at 44.)  Also, his back bothers him when he goes up or down stairs.  (Id.)  He cannot sit or stand for very long.  (Id.)  He cannot walk farther than a block before having to stop; he cannot stand or sit for longer than twenty minutes before having to change positions.  (Id. at 45.)  He cannot lift "very much."  (Id.)  He takes Flexeril twice a day and pain medication four times a day.  (Id. at 44.)

Plaintiff has problems sleeping due to his Crohn's disease, for which he takes Humira.  (Id. at 40, 42, 50.)  His concentration and memory are not good.  (Id. at 40.)  Lately, he has daily problems with vomiting and diarrhea.  (Id. at 42.)

Plaintiff's girlfriend goes to the doctor with him.  (Id. at 46.)  He is being treated by a psychiatrist, Dr. Kerr.  (Id.)  In his free time, he likes to read.  (Id. at 51.)

Asked if he had been let go from any jobs, Plaintiff explained that he has because he could not do the work and could not be around people.  (Id. at 53.)

Dr. Upton was asked to assume a claimant of Plaintiff's age, limited tenth grade education, past work history, which did not include any light work, and an ability to do light work; lift twenty pounds occasionally and ten frequently; stand, walk, or sit for a total of six

hours in an eight-hour day; do simple routine and independent tasks; and occasionally balance, kneel, crouch, crawl, stoop, and climb ramps and stairs. (Id. at 57.) This claimant cannot climb ladders, ropes, or scaffolds or have any social interaction that is more than superficial. (Id.) Asked if there are any jobs such a claimant can do, Dr. Upton replied that are and listed three: housekeeper, laundry worker, and hand packager. (Id. at 57-58.) Other than customary work breaks, an individual cannot be off task more than 10 percent of the time in order to maintain employment. (Id. at 58.) Nor can the individual be absent from work three or more times a month. (Id.)

Dr. Upton further stated that there is no conflict between his testimony and the *Dictionary of Occupational Titles* (DOT). (Id. at 58-59.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his applications, school records, records from health care providers, and assessments of his mental functional capacities.

On a Function Report, Plaintiff described what he does during the day. (Id. at 189.) He gets up, showers, dresses, works around the house, and spends time with his daughter when she returns from school. (Id.) He usually stays home because he does not like to leave the house. (Id.) With the help of his girlfriend, he feeds and takes care of two dogs. (Id. at 190.) Sometimes, he does the laundry or washes dishes. (Id. at 191.) He does not prepare meals. (Id.) His impairments adversely affect his abilities to lift, squat, bend, stand, walk, sit, remember, concentrate, understand, follow instructions, and get along with others. (Id.

at 194.) He cannot walk farther than a couple of blocks before having to stop and rest for a few minutes. (Id.) He cannot pay attention for longer than fifteen minutes. (Id.) He does not follow written or spoken instructions well. (Id.) He also does not handle stress well. (Id. at 195.) He does not get along well with authority figures because he does "not like to be bossed or put down." (Id. at 195.) He uses a brace because his ankle was fractured. (Id.)

Plaintiff's girlfriend, Teresa Lincoln, wrote a letter explaining that Plaintiff's problem of being in public and around people has become worse as he gets older. (Id. at 225.)

Plaintiff's school records end with the tenth grade. (Id. at 200-01.) Plaintiff received Bs and Cs in the second semester in the academic subjects and an F in Physical Education. (Id. at 201.) An Individualized Education Program for Plaintiff when he was in the tenth grade indicates he was reading orally at approximately the fifth grade level, had poor writing skills, and was spelling at the seventh grade level. (Id. at 203.) His test scores on the Wechsler Adult Intelligence Scale – Revised (WAIS-R) placed him the low average range of intelligence. (Id. at 207.) He was classified as learning disabled in basic reading skills and written expression. (Id. at 208.)

The relevant medical records before the ALJ begin in August 1999 when Plaintiff went to the emergency room at St. Francis Medical Center for back pain for the past two days and pain with deep breaths or changes in position. (Id. at 276-78.) He had been mowing grass, but had not injured himself. (Id. at 276, 278.) A chest x-ray was negative. (Id. at 276.) He was diagnosed with musculoskeletal back pain, prescribed Soma and Ultram, told to follow up with Dr. Doyle, and released. (Id. at 276-77.)

The following week, Plaintiff saw Edward Doyle, M.D., reporting that the lumbosacral spasm that had earlier sent him to the emergency room had not gone away. (Id. at 263.) He was prescribed Soma with codeine and was to return in three days if there was no improvement. (Id.)

Plaintiff next saw Dr. Doyle in August 2001 for his nerves and for back pain he had had for the past two days "after helping someone move." (Id. at 260-61, 268-69, 272.) On a Well-Being Chart, Plaintiff checked the boxes for frequent negative thinking, keyed up/on edge, nervousness, restlessness, sweating, irritability, tension, constant worry, and headache. (Id. at 272.) He was not currently taking any medications. (Id.) He also reported that he occasionally felt paranoid. (Id.) Plaintiff was diagnosed with anxiety, depression, and lumbosacral strain; prescribed Xanax (an anti-anxiety medication) and Paxil (an antidepressant); had a thyroid panel taken; and was to return in seven days. (Id. at 260.)

Plaintiff returned in September, reporting that the Xanax and Paxil had provided some relief of his anxiety and depression; his lumbosacral strain had not improved. (Id. at 258-59.) His dosages of Xanax and Paxil were increased, and he was to return in seven to ten days. (Id.)

Plaintiff's anxiety and depression were reportedly greatly improved when he saw Dr. Doyle on October 8. (Id. at 256-57.) His musculoskeletal system was unremarkable. (Id. at 256.) He was continued on Paxil and was to return in one month. (Id.)

Having run out of Paxil four days earlier, Plaintiff returned to Dr. Doyle on January 25, 2002, for his complaints of nervousness and also of a cough, sore throat, and back pain

due to the coughing.  (Id. at 254-55, 266-67.)  Plaintiff was given intermuscular injections of an antibiotic, Rocephin, and a steroid, Depo-Medrol; prescribed Toradol, a nonsteroidal anti-inflammatory drug (NSAID); and prescribed an increased dosage of Paxil.  (Id. at 254.) Plaintiff was to return in seven days.  (Id.)

Plaintiff did not see Dr. Doyle again until May 13, 2010, reporting he had been off the Paxil for a year and his nerves were now worse.  (Id. at 251-53.)  On a Patient Health Questionnaire (PHQ), he marked that during the past two weeks he felt bad about himself, he moved or spoke so slowly that people noticed or he moved around a lot more than usual, and he was down, depressed, or hopeless.  (Id. at 253.)  For several days during that period, he had little interest or pleasure in doing things, had trouble falling or staying asleep or sleeping too much, felt tired or had little energy, had trouble concentrating, and had thoughts he would be better off dead or had thoughts of hurting himself.  (Id.)  These problems made it very difficult for him to work, take care of things at home, or get along with people.  (Id.) He had had these problems for two or more years.  (Id.)  Plaintiff was diagnosed with generalized anxiety disorder (GAD) and major depression.  (Id. at 252.)  He was prescribed Celexa (an antidepressant) and Klonopin (an anti-anxiety medication) and was referred for counseling.  (Id. at 252.)

Twelve days later, Plaintiff told Dr. Doyle that the medications were not working and he was not sleeping.  (Id. at 248-50.)  His anxiety had increased.  (Id. at 248.)  His responses on the PHQ were generally the same as before.  (Id. at 250.)  His medication dosages were increased.  (Id. at 249.)

When seeing Dr. Doyle again, on June 29, Plaintiff reported that the medications were not helping. (Id. at 245-47.) He was out of the Klonopin. (Id. at 245.) His responses on the PHQ reflected worsening symptoms, with four of the nine occurring nearly every day, four occurring more than half the time, and only one occurring for several days during the past two weeks. (Id. at 247.) His dosages of both medications were again increased. (Id. at 246.)

Plaintiff saw Kenneth W. Green, Jr., L.C.S.W., on July 7. (Id. at 238-41.) He was in "considerable despair" and reported "considerable anxiety symptoms" and sporadic problems with depression. (Id. at 239.) His anxiety began in childhood and caused, among other things, racing thoughts and an inability to concentrate. (Id.) He was sometimes paranoid and thought people were talking about him or making fun of him; this prevented him from being able to maintain employment. (Id.) He heard voices, although he could not understand what they were saying, and had problems staying asleep. (Id.) He had recently been arrested on charges of marijuana possession. (Id. at 240.) He regularly used marijuana to calm down. (Id.) He had a history of alcohol abuse, resulting in a DWI charge, but had not had a drink in the last few months. (Id.) His visits to his primary care physician had been sporadic due to lack of funds for sliding scale payments. (Id.) He lacked the ability to form relationships with those outside his family and was unable to hold a job due to his presenting symptoms. (Id.) He had chronic lower back pain. (Id.) On examination, his gait was normal. (Id.) His mood was anxious; his affect was stable; his thought processes were coherent and occasionally distracted; his reasoning was practical; his memory functions were impaired by his worry and anxiety; his manner and attitude were cooperative; his insight was

poor; his judgment was fair; his fund of information was below expectation for his age; and his intellectual ability was in the average to slightly below average.  (Id.)  He was in a long-term relationship with the mother of his daughter.  (Id. at 241.)  He did odd jobs and mowed yards.  (Id.)  Mr. Green diagnosed Plaintiff with GAD and panic disorder with agoraphobia. (Id.)  His current Global Assessment of Functioning (GAF) was rated as 45.[3]  (Id.)  Mr. Green opined that Plaintiff was so anxious he was not understanding what Mr. Green was telling him about managing panic attacks and informed Plaintiff that he should bring his girlfriend with him to the next session.  (Id.)

Plaintiff and his girlfriend met with Mr. Green on August 4.  (Id. at 237.)  Plaintiff had begun taking Risperdal, which helped with his racing thoughts and auditory hallucinations but caused him problems with his sleep.  (Id.)  His girlfriend thought his moods were "'a little better.'"  (Id.)  Mr. Green encouraged Plaintiff to stay on his medication until seeing his psychiatrist.  (Id.)

Two weeks later, Plaintiff underwent a psychiatric evaluation by Jim F. Kerr, D.O., a staff psychiatrist with Community Counseling Center.  (Id. at 228-33, 299-301.)  Plaintiff was described as having acceptable hygiene and grooming, being cooperative, and

---

[3]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'"" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV-TR at 34 (emphasis omitted).

occasionally having trouble remembering his "historical events."  (Id. at 228.)  He reported that he sometimes hears voices that are not understandable.  (Id.)  This started in his childhood.  (Id.)  Also, he has been paranoid his whole life.  (Id.)  Recently, he was having trouble sleeping and was more irritable and fidgety.  (Id.)  He did not like being around a lot of people and often thought people were making fun of him.  (Id.)  He was then taking Risperdal twice a day and had formerly taken Celexa and Xanax.  (Id.)  He thought he had a chronic back problem.  (Id.)  He left school after the tenth grade to go to work and help with family expenses.  (Id. at 229.)  Currently, he occasionally mowed neighborhood lawns.  (Id.)  He had recently been arrested for possession of marijuana, which he used to calm down.  (Id.)  He liked to fish and watch television.  (Id.)  On examination, Plaintiff was anxious and tense and had a depressed mood.  (Id.)  He occasionally was hesitant or delayed in answering questions.  (Id. at 230.)  He had no flight of ideas or loose thought associations.  (Id.)  He reported having hallucinations.  (Id.)  He was oriented to time, place, and person, but had difficulty with recent and remote memory.  (Id.)  His insight was fair.  (Id.)  His gait was normal.  (Id.)  His intelligent quotient (IQ) appeared to be in the low, normal range.  (Id.)  Dr. Kerr diagnosed Plaintiff with schizoaffective disorder, mixed type, currently depressed, and rule out major depressive disorder, recurrent with psychotic symptoms.  (Id.)  He had borderline intellectual functioning and a current GAF of 47.  (Id.)  Dr. Kerr recommended Plaintiff continue to take Xanax and Risperdal and started him on Seroquel (an antipsychotic medication).  (Id. at 230, 231.)  He also recommended Plaintiff apply for disability.  (Id. at 230.)

When next seeing Mr. Green, on September 2, Plaintiff reported feeling "'some better'" and appeared calmer.  (Id. at 236.)

The same day, Plaintiff consulted Dr. Doyle after falling and injuring his lower back and twisting his right ankle.  (Id. at 242-44.)

Plaintiff saw Dr. Kerr on September 19.  (Id. at 280, 312.)  He was hearing the voices less frequently and was sleeping better, but still felt paranoid.  (Id.)  Dr. Kerr noted that Plaintiff was ambiguous about what he meant by paranoid and thought Plaintiff's symptoms were more consistent with social avoidance.  (Id.)  His GAF was 51.[4]  (Id.)  His medications were unchanged.  (Id.)

Plaintiff did not show for his October 5 appointment with Dr. Kerr.  (Id. at 279, 311.)  A notation entered in his records two days later indicated that Plaintiff was receiving Medicaid.  (Id. at 311.)

Plaintiff told Dr. Kerr when seeing him on October 19 that he had Medicaid and was feeling "'a lot better.'"  (Id. at 310.)  His paranoia was better and the voices were not as bad as before.  (Id.)  He was less suspicious and felt more comfortable when he was away from his house.  (Id.)  He was thinking about starting to go to church.  (Id.)  On examination, he had a normal gait and was oriented to time, place, and person.  (Id.)  His insight and judgment

---

[4]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV-TR at 34 (emphasis omitted).

were poor.  (Id.)  His diagnosis was schizoaffective disorder mixed; his GAF was 46.  (Id.)  He was prescribed Xanax, Risperdal, and Seroquel.  (Id.)

Plaintiff was sick and unable to keep his November 17 appointment with Dr. Kerr. (Id. at 308.)  On December 15, he did not keep his appointment, but called two hours later to request a refill of his medications.  (Id. at 307.)  He was given a twenty-day supply and told he must keep his next, January 2011 appointment.  (Id.)

On November 18, Dr. Doyle completed a Missouri Department of Social Services Medical Report Including Physician's Certification/Disability Evaluation on Plaintiff's behalf. (Id. at 281-82.)  He listed Plaintiff's complaints as panic disorder with agoraphobia, GAD, and chronic back pain.  (Id. at 281.)  Plaintiff took hydrocodone for his break-through pain. (Id. at 282.)  Dr. Doyle opined that he was currently unable to function.  (Id.)

X-rays taken of Plaintiff's lumbar spine at the end of November were normal.  (Id. at 328.)

Plaintiff consulted Dr. Doyle on December 21 for his back pain.  (Id. at 329-33.)  He was diagnosed with back pain and GAD, and prescribed Flexeril (a muscle relaxant), hydrocodone-acetaminophen, and alprazolam (a generic form of Xanax).  (Id. at 330.)  He was also given an intermusclar injection of Depo Medrol and Toradol.  (Id. at 332-33.)

Plaintiff informed Dr. Kerr in January 2011 that he had not been getting out in public but had been watching television.  (Id. at 305.)  He and his girlfriend had had family over to their house for Christmas.  (Id.)  His appetite and sleep were okay, but his thought process was paranoid, his thought content was worrisome, and his mood was occasionally more

irritable. (Id.) Also, he had fallen and was having back pain. (Id.) His diagnosis and prescriptions were unchanged. (Id.) His GAF was 47. (Id.)

Plaintiff saw Dr. Doyle on February 1 for complaints of back, hip, and joint pain, weakness, depression, anxiety, and fatigue. (Id. at 334-37.) He had a full range of motion in all his joints and was described as generally "[d]oing well except for back pain flareup worse with weather." (Id. at 336.) His diagnosis was unchanged; Reprexain (a combination of hydrocodone and ibuprofen prescribed for the short-term relief of severe pain) was added to his prescriptions. (Id.) Eight days later, Plaintiff telephoned Dr. Doyle to report that the Reprexain was not working. (Id. at 338.) The dosage was increased. (Id.)

Plaintiff returned to Dr. Doyle on March 3 for back, hip, and joint pain and numbness and weakness. (Id. at 340-44.) He was given an intermusclar injection of Decadron (a corticosteroid), Depo Medrol, and Toradol; diagnosed with back pain, GAD, and gastroesophageal reflux disease (GERD); and prescribed alprazolam for the GAD, Zantac for the GERD, and hydrocodone-acetaminophen, Flexeril, and Reprexain for the back pain,. (Id. at 341, 343.)

Plaintiff also saw Mr. Green on March 3, reporting that the medications were helping him manage his anxiety and "difficulties with thinking." (Id. at 398.) Mr. Green described him as "significantly improved." (Id.) Plaintiff was "considering returning for some behavioral training to manage day to day activities and stresses" and was to set up an appointment soon. (Id.)

A lumbar spine x-ray taken the next week revealed mild disc bulge with small right posterolateral disc protrusion at L5-S1 that encroaches on the right S1 nerve root. (Id. at 346-47.)

On April 1, Plaintiff consulted Dr. Doyle for his back pain and refills of medication. (Id. at 348-52.) The pain had recently flared up after Plaintiff lifted a washer at home and radiated to his hips, legs, and feet. (Id. at 348.) It was aggravated by activity and alleviated by inactivity and medication. (Id.) Plaintiff also complained of depression, anxiety, and fatigue. (Id.) On a PHQ, he responded that he had five of the nine symptoms for more than half the days, three for several days, and one (thinking he would be better off dead) not at all. (Id. at 350-51.) He was diagnosed with back pain, GAD, and panic disorder with agoraphobia. (Id. at 351-52.) His prescriptions for Reprexain and Flexeril were renewed; his prescription for hydrocodone-acetaminophen was stopped. (Id. at 351.)

Plaintiff was unable to keep his May 3 appointment with Dr. Kerr because he was sick, but requested that a refill of his prescriptions be called into the pharmacy. (Id. at 302.)

Plaintiff saw Mr. Green for therapy on July 19. (Id. at 397.) His affect was flat; his mood was anxious; his speech was slow and mildly slurred; his conversation was spontaneous and purposeful. (Id.) His auditory hallucinations had significantly decreased but continued to interfere with his daily life. (Id.) He was trying to stay busy. (Id.) Mr. Green noted that Plaintiff was "returning to clinic service after being discharged related to urine drug screen." (Id.) He was going to see Plaintiff every two weeks. (Id.)

When next seeing Mr. Green, on August 3, Plaintiff reported increased depression and decreased energy . (Id. at 396.)  He complained of back pain and had a "gait suggestive of discomfort."  (Id.)  He had rejected Dr. Kerr's recommendation he have weekly case management services visits to his home because he did not want anyone coming to his house. (Id.)

The same day, Plaintiff was given an intermuscular injection of Toradol by Dr. Doyle. (Id. at 353-54.)

On August 12, Plaintiff complained to Dr. Doyle of chills, nausea, diarrhea, and vomiting for the past two days.  (Id. at 355-59.)  He was diagnosed with dehydration and gastroenteritis; given an intermuscular injection of Phenergan; and told to increase his intake of fluids.  (Id. at 355-59.)

When seen five days later by Mr. Green, Plaintiff was described as anxious and worried.  (Id. at 395.)  At his August 31 session, Plaintiff's mood and affect were as before. (Id. at 394.)  Mr. Green noted that he was focused on his back pain.  (Id.)

On September 6, Dr. Kerr completed a Mental Health Source Document – Depression and/or Anxiety send him by Plaintiff's attorney.  (Id. at 315.)  Dr. Kerr marked that six of the seven symptoms of depression and six of the seven symptoms of anxiety were present.  (Id. at 315.)  He answered "yes" to questions whether Plaintiff felt overwhelmed by simple day to day stressors and whether his condition was progressive and its symptoms expected to worsen or occur more frequently.  (Id.)  He would likely be absent from work more than three times a month and was severely limited in his ability to deal with work stress.  (Id.)  He did

not maintain good attendance at therapeutic appointments. (Id.) His mental impairments would be disabling regardless of any drug addiction or alcoholism and his physical or mental limitations caused by his non-drug or alcohol-related impairments were not caused or exacerbated by drug or alcohol use. (Id. at 316.)

Plaintiff was evaluated by Bertha Walker, M.A., and Tara Messmer, B.S., C.S.C., on September 13 for participation in the Community Psychiatric Rehabilitation Program.[5] (Id. at 317-23.) He was reportedly on probation until 2013 for the marijuana possession charge. (Id. at 317.) He had chronic back problems and seasonal allergies. (Id.) He lived with his girlfriend and their teenage daughter. (Id. at 318.) He received food stamps. (Id.) His girlfriend worked and paid all the bills. (Id.) He reported feeling safe in his house and preferring not to leave it. (Id.) He showered daily, shaved, and washed his hair. (Id.) He was appropriately dressed. (Id.) He did not use public transportation and relied on his family for transportation. (Id.) His girlfriend did the shopping and the cooking. (Id. at 319.) He could not sweep, mop, or vacuum because of his back. (Id.) He could do some work such as dishes but could not stand for long periods of time. (Id.) He had no interest in going back to work or in getting his GED. (Id.) He liked watching television and playing video games with his daughter. (Id.) Since childhood, he had been anxious and heard voices. (Id. at 320.) He had a history of alcohol and drug use. (Id.) His sleep and appetite were poor. (Id.) On examination, his affect was flat; his eye contact was good; his thought processes were logical

---

[5]Plaintiff was admitted to the program on October 13 and discharged on November 28 after failing to show for any scheduled appointments. (Id. at 324.)

and coherent; his intellectual functioning appeared to be a little below average; and his speech seemed pushed.  (Id.)  He was cooperative, responsive, and oriented to time, place, and person.  (Id.)  He did not have any auditory or visual hallucinations, but had heard voices in the past.  (Id.)  He had mood swings and "some depression."  (Id.)  He wanted help with learning how to deal with anxiety, depression, racing thoughts, and hearing voices.  (Id. at 321.)  His primary obstacle was his paranoia and anxiety preventing him from getting out into the community and improving his skills.  (Id. at 322.)  He was to be seen by a caseworker every week for at least a year and was to continue to see his psychiatrist.  (Id.)

At his session the next day with Mr. Green, Plaintiff was described as having a flat affect and speech, a calm and neutral mood, and an intact thought process.  (Id. at 393.)  He was focused on his physical complaints.  (Id.)

Two weeks later, Plaintiff was more able to engage in spontaneous conversation with Mr. Green, including talking about a fishing trip.  (Id. at 392.)  He did not complain of pain or of emotional stress.  (Id.)  Mr. Green described Plaintiff as "as stable" as he had seen him. (Id.)

Plaintiff informed Mr. Green on October 18 that he had been doing fairly well until the previous week when he had physical problems.  (Id. at 391.)

In November, Plaintiff talked with Mr. Green about family coming for Thanksgiving. (Id. at 390.)  He did not appear to be in acute distress.  (Id.)  Plaintiff said he had arranged to meet with his case manager at the office rather than the home because the latter was too

stressful.  (Id.)  Plaintiff was much the same at his December visit with Mr. Green.  (Id. at 389.)

In January 2012, Plaintiff reported to Mr. Green that he had had a good holiday with his family and was feeling and looking better.  (Id. at 388.)  His affect was flat; his mood worrisome; his speech slow; his thought processes intact.  (Id.)

Plaintiff saw Dr. Doyle on February 16 for back pain, anxiety, depression, and a refill of his medications.  (Id. at 360-64.)  The pain had recently flared up after Plaintiff lifted a washer at home and radiated to his hips, legs, and feet.  (Id. at 360.)  It was aggravated by activity and alleviated by inactivity and medication.  (Id.)  Plaintiff also complained of fatigue, weakness, malaise, joint pain, stiffness, arthritis, and an intolerance for cold.  (Id. at 361.)  On examination, he was weak in his lower legs and had a reduced range of motion in his cervical and lumbosacral spines.  (Id. at 362-63.)  Straight leg raises[6] were positive, as was a Fabere maneuver.[7]  (Id. at 363.)  On a PHQ, he responded that he had had one of the nine symptoms (feeling bad about himself) nearly every day, six for more than half the days, one for several days, and one (thinking he would be better off dead) not at all.  (Id. at 364.)  He was diagnosed with back pain and depression and was prescribed Reprexain (a combination

---

[6]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended."  **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 (8th Cir. 2009) (internal quotations omitted).

[7]A positive Fabere's sign indicates the presence of sacroiliac joint dysfunction in patients with lower back pain.  See Dorland's Illustrated Medical Dictionary, 1896 (32nd ed. 2012).  The word "Fabere" is derived from "the initial letters of the movements necessary to elicit [the sign]:  flexion, abduction, external rotation, extension."  Id.

of hydrocodone and ibuprofen prescribed for the short-term relief of severe pain) and Flexeril.  (Id. at 363, 364.)

Eight days later, Plaintiff was given an injection of Toradol by Dr. Doyle's nurse.  (Id. at 365.)

Plaintiff consulted a gastroenterologist, Dean Edwards, M.D., on March 12 about an abnormal abdominal computed tomography (CT) scan.  (Id. at 445-53.)  On examination, he had normal findings, including normal judgment and insight, and no evidence of depression, anxiety, or agitation.  (Id. at 447.)  Dr. Edwards scheduled a colonoscopy, which revealed ulcers and findings consistent with Crohn's disease.  (Id. at 367-68, 440-45, 447.)

Two days later, Plaintiff discussed the recent diagnosis of Crohn's disease with Mr. Green.  (Id. at 387.)

On March 16, further tests revealed a small sliding hernia and other findings consistent with Crohn's disease.  (Id. at 369-70, 438-39.)  Plaintiff was prescribed prednisone and was to follow-up in one week.  (Id. at 441.)

Plaintiff saw Dr. Doyle on March 19 for back pain, anxiety, depression, and a refill of his medications.  (Id. at 371-75.)  On examination, he was weak in his lower legs and had a reduced range of motion in his cervical and lumbosacral spines.  (Id. at 373-74.)  As before straight leg raises and Fabere signs were positive.  (Id. at 374.)  On a PHQ, he responded that he had had two of the nine symptoms for more than half the days, six for several days, and one not at all.  (Id. at 375.)  He was diagnosed with lumbar back pain and GAD.  (Id. at 374.)

When seeing Dr. Edwards the next day, Plaintiff reported that he had had a marked improvement in his abdominal/gastrointestinal symptoms since taking the prednisone. (Id. at 430-37.) Plaintiff was continued on a tapering dose of prednisone. (Id. at 431.) Infliximab therapy (a prescription medication used to reduce inflammation caused by Crohn's disease) was to be initiated in the near future. (Id. at 434.)(Id.) (Id.)

Plaintiff told Mr. Green on April 11 that he had been more physically active, i.e., had been mowing grass and taking walks, and had recently gone fishing. (Id. at 386.) His pain, affect, speech, and mood were as before. (Id.)

Plaintiff underwent an endoscopy on April 30 after having problems for the past two days and was found to have patchy erythema, a small hiatal hernia, and erosions/ulcerations. (Id. at 377-78, 422-29.) Protonix, a proton pump inhibitor, was prescribed by Dr. Edwards. (Id. at 378.)

The next week, Plaintiff reported to Mr. Green that he was decreasing his activities away from home due to anxiety about his Crohn's disease symptoms. (Id. at 385.) He was going to try to go to a restaurant that Sunday. (Id.)

Plaintiff returned to Dr. Edwards on May 17 for a follow-up visit. (Id. at 410-21.) He reported not feeling well generally and complained of increased diarrhea and abdominal cramping after stopping the prednisone. (Id. at 410.) His muscles ached; his calves cramped at night; and his appetite was decreased. (Id.) He appeared anxious, but not distressed. (Id. at 411.) Plaintiff was diagnosed with Crohn's disease of the small bowel with abdominal pain and diarrhea; esophagitis; and acute gastritis. (Id. at 417, 419.) He was continued on his

current medications, Humira and pantoprazole; also prescribed budesonide (a steroid used to treat mild to moderate Crohn's disease) and Pylera; and was to have a complete metabolic panel run.  (Id. at 413, 421.)

Four days later, Plaintiff saw Dr. Doyle for back pain, anxiety and depression.  (Id. at 379-84.)  On examination, he had a normal, full range of motion in all joints and no clubbing, cyanosis, or edema in his extremities.  (Id. at 383.)  He appeared to be in mild to moderate pain and distress.  (Id.)  He had a depressed affect; his anxiety was stable on his medications.  (Id.)  Plaintiff's responses on the PHQ indicated that he had four of the nine symptoms for more than half the days; three for several days; and two not at all.  (Id. at 382.)  His diagnoses were Crohn's disease, back pain, and GAD.  (Id. at 384.)  Budesonide and promethazine were prescribed; daily exercise was recommended.  (Id. at 381.)

When seen by Dr. Edwards on May 31, Plaintiff reported that he had had some improvement in his abdominal pain and cramping and in his loose stools.  (Id. at 399-409.)  An over-the-counter medication, omeprazole, was recommended and Imuran therapy was initiated.  (Id. at 399, 402.)

In July, Plaintiff reported to Dr. Kerr that he was living in the same house with the same girlfriend as before and wanted to get married.  (Id. at 457.)  His mood was variable, irritable, depressed, and anxious.  (Id.)  He was socially avoidant.  (Id.)  His sleep was occasionally good; his appetite was decreased.  (Id.)  His speech was slow and halting; his insight and judgment were poor.  (Id.)  He had been having crying spells and had recently

heard voices.  (Id.)  Dr. Kerr discontinued the Xanax and renewed the Valium, Risperdal, and Seroquel prescriptions.  (Id.)

The same day, Dr. Kerr wrote that Plaintiff's condition remained the same and his responses on the Mental Health Source Document, see pages 15 to 16, supra, were unchanged.  (Id. at 454-56.)

Also before the ALJ was a Psychiatric Review Technique form completed in December 2010 by a none-examining consultant, Stephen Scher, Ph.D.  (Id. at 284-95.)  Dr. Scher assessed Plaintiff for the period from January 31, 1999, to the present.   (Id. at 284.) He determined that Plaintiff had a psychotic disorder (schizoaffective disorder, mixed), an affective disorder (history of depression), an anxiety-related disorder (history of anxiety), and a substance addiction disorder (cannabis abuse, early full remission).  (Id. at 284, 286, 287, 288, 290.)  These disorders resulted in marked restrictions in activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace.  (Id. at 292.)  They did not cause any episodes of decompensation of extended duration.  (Id.)  Dr. Scher noted that he had reviewed Plaintiff's school records and 2010 medical records of July 7, August 4, August 17, September 2, and September 19.  (Id. at 294.)  Addressing Plaintiff's SSI application, Dr. Scher characterized Plaintiff as reporting a lifelong condition with limited treatment.  (Id.)

On a Mental Residual Functional Capacity Assessment form, Dr. Scher assessed Plaintiff as being moderately limited in one of the three abilities in the area of understanding and memory, i.e., understanding and remembering detailed instructions, and not significantly

limited in two. (Id. at 296.) In the area of sustained concentration and persistence, he was moderately limited in two of the eight listed abilities, i.e., (i) carrying out detailed instructions and (ii) working in coordination with or proximity to others without being distracted by them, and was not significantly limited in the other six abilities. (Id. at 296-97.) In the area of social interaction, Plaintiff was moderately limited in three of the abilities – interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes – and not significantly limited in the remaining two. (Id. at 297.) In the area of adaptation, he was moderately limited in his ability to travel in unfamiliar places or use public transportation and was not significantly limited in the other three listed abilities. (Id.)

## The ALJ's Decision

The ALJ first found that Plaintiff met the insured status requirements of the Act through September 30, 2002, and has not engaged in substantial gainful activity since his alleged onset date of January 31, 1999. (Id. at 16.) He has severe impairments of degenerative disc disease, depression, schizoaffective disorder, anxiety, panic with agoraphobia, and borderline intellectual functioning. (Id.) His Crohn's disease was severe, but had not lasted at least twelve months and was not expected to persist for twelve continuous months. (Id. at 17.) Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of listing-level severity. (Id.) His severe mental impairments resulted in mild restrictions in activities of daily living, moderate

- 23 -

difficulties in social functioning, moderate difficulties in concentration, and no limitations in persistence or pace. (Id. at 17-18.) He had not had any episodes of decompensation of extended duration. (Id. at 18.) When assessing Plaintiff's activities of daily living and social functioning, the ALJ noted that Plaintiff has been living with his girlfriend for twenty years and gets along with her. (Id. at 17.) He goes to the store, although not alone, and "has some friends." (Id.)

The ALJ further found that Plaintiff has the residual functional capacity (RFC) to perform light work with limitations of lifting or carrying no more than twenty pounds occasionally and ten pounds frequently; standing, walking, or sitting for a total of six hours in an eight-hour workday; and occasionally balancing, kneeling, crouching, crawling, stooping, and climbing ramps and stairs. (Id. at 18.) Plaintiff can do simple routine tasks that can be performed independently and that involve working primarily with things, not people, and in non-public settings. (Id. at 18-19.) He cannot climb ladders, ropes, or scaffolds. (Id. at 18.) He should have no more than superficial social interaction with other people. (Id. at 19.)

When evaluating Plaintiff's RFC, the ALJ assessed his credibility and found it wanting on the grounds that (a) his activities of daily living were inconsistent with his allegations and (b) there was no objective medical evidence supporting the severity of his allegations, including no diagnostic testing, no treatment of his back pain by a specialist, and only sporadic treatment of his psychiatric treatment. (Id. at 20-22.)

Addressing Dr. Doyle's November 2010 statement, the ALJ discounted it as being done by a physician "after a one-time examination for the purpose of a Medicaid application" when employing a definition of disability different than the Act's statutory and regulatory definition. (Id. at 22.)

Next, the ALJ noted the medical source statement completed by Dr. Kerr, but declined to give it full weight. (Id.) The ALJ noted that Plaintiff stopped going to Dr. Kerr after the September 2011 statement until July 2012, that the finding of a borderline IQ was not consistent with Plaintiff having obtained a driver's license, and that the statement was not consistent with Plaintiff taking walks, mowing grass, and going fishing. (Id.) Nor was the GAF of 49 consistent with Plaintiff living with the same girlfriend for twenty years. (Id.) Additionally, there were often no positive mental signs in Plaintiff's records. (Id. at 23.) Addressing Plaintiff's daily activities, the ALJ noted that he helped someone move in August 2001 and that Plaintiff reported in July 2010 that he was doing odd jobs and mowing yards, in August 2010 that he was mowing lawns, in February 2012 that he lifted a washing machine at home, and in April 2012 that he had been mowing grass, taking walks, and fishing. (Id. at 23-24.) In May 2012, he was going to a restaurant. (Id. at 24.) In July 2012, he reported that he wanted to get married. (Id.) Also, Plaintiff's work history was not consistent,[7] he was not motivated to work before the alleged onset date, and there was no apparent reason why the alleged onset date was January 31, 1999. (Id. at 20.) The ALJ discounted the report of

---

[7]Plaintiff had earnings from 1990 to 1993, 1995 to 1999, and in 2002, 2005, and 2006. (Id. at 154.) His earnings in 1998 were $1,944, in 1999 were $954, in 2002 were $29, in 2005 were $998, and in 2006 were $ 686. (Id.)

Plaintiff's girlfriend because it was not supported by the medical evidence, she was not medically trained, and she was not a disinterested third party.  (Id. at 24.)

With his RFC, Plaintiff was not able to perform any past relevant work.  (Id. at 24-25.)  With his RFC, age, and limited education, there are jobs Plaintiff can perform in the national economy.  (Id. at 25-26.)

The ALJ concluded that Plaintiff is not disabled within the meaning of the Act.  (Id. at 28.)

**Standards of Review**

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A).  Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months.  **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002).  Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'"  **Phillips v. Colvin**, 721 F.3d 623, 625 (8th

Cir. 2013) (quoting <u>Cuthrell v. Astrue</u>, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and § 416.920 (a)). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." <u>See</u> 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. <u>See</u> 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." <u>Id.</u>

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. <u>See</u> 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting <u>Coleman v. Astrue</u>, 498 F.3d 767, 770 (8th Cir. 2007)).

Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the *Polaski* factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step four remains with the claimant to prove his RFC. **Moore**, 572 F.3d at 523; accord **Dukes v.**

**Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine

whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.

## Discussion

Plaintiff argues that the ALJ improperly weighed the opinions of Drs. Scher, Kerr, and Doyle, giving too much weight to the first and too little to the second and third. The Commissioner disagrees.

The Title II Application. Plaintiff applied for DIB and SSI in August 2010, alleged a disability onset date of January 31, 1999, and was insured only through September 2002. The medical records reflect treatment beginning in August 1999, sought again in August 2001, September 2001, October 2001, and January 2002, and then not sought until May 2010. Given this gap between the relevant dates and treatment for the DIB application and those for the SSI application, the Court will consider the two separately.

Plaintiff earned $954 in 1999, working for two employers. (R. at 152.) He earned nothing in 2000 and 2001 and only $29 in 2002. (Id. at 154.) His medical records begin eight months after his alleged disability onset date and were for emergency treatment of a condition – back pain – that he described as having begun two days earlier. He saw a physician, Dr. Doyle, the following week for the pain, was prescribed pain medication, and was told to

return in three days if there was no improvement. He returned two years later, in August 2001. As he had in August 1999, the conditions for which he sought treatment – nerves and back pain – he described as having been present for two days. He sought treatment once in September 2001 and again in October 2001, reporting great improvement. He returned to Dr. Doyle in January 2002, was treated and prescribed an antidepressant, and was to return in seven days. Plaintiff did not return for more than eight years.

As noted above, a claimant has the burden of establishing he is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. §§ 423(d)(1). Plaintiff has failed to carry this burden on his DIB application. The ALJ did not err in denying it.

The SSI Application. The time restrictions governing consideration of Plaintiff's DIB application are not relevant to the consideration of his SSI application. For the reasons set forth below, the Commissioner's decision on that application is reversed and the case shall be remanded.

The ALJ determined that Plaintiff has severe mental impairments of depression, schizoaffective disorder, anxiety, and panic with agoraphobia.[8] The ALJ also found that Plaintiff's severe mental impairments, together with his degenerative disc disease and

---

[8]"Agoraphobic fears typically involve characteristic clusters of situations that include being outside the home alone; being in a crowed or standing in a line; being on a bridge; and traveling in a bus, train, or automobile." *DSM-IV* at 433. Plaintiff clearly has such fears. He does not use public transportation and his girlfriend often goes to the doctor with him. The only other place he goes is to the pharmacy.

borderline intellectual functioning, resulted in only mild restrictions in his activities of daily living, citing activities by Plaintiff in August 2001, July 2010, August 2010, February 2012, April 2012, and May 2012. The regulations define activities of daily living as "includ[ing] adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for [one's] grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. Pt. 404, Subpt. P. App'x 1, § 12.00(C)(1). The quality of these activities is to be assessed "by their independence, appropriateness, effectiveness, and *sustainability*." Id. (emphasis added). A claimant may be found to have marked limitations in his or her activities of daily living if the claimant has "serious difficulty performing them . . . on a consistent, useful, routine basis . . . " Id.

Other than caring for his personal grooming, there is no evidence in the record that Plaintiff effectively did any daily activity on a routine, sustained basis. The household chores he does, e.g., cooking, vacuuming, and washing dishes, and yard work, mowing his lawn, are not done consistently. Consistent with his panic disorder with agoraphobia, see note 8, supra, he does not use public transportation, is often accompanied by his girlfriend when he goes to the doctor or to his therapist, and does not go shopping. As noted by the ALJ, in August 2001 he helped someone move. One month shy of ten years later, he reportedly did odd jobs and mowed yards. The next month, he told Dr. Kerr he *occasionally* mowed neighborhood lawns. Eighteen months later, in February 2012, Plaintiff sought treatment for a flare-up of back pain caused by lifting a washer at home. In April 2012, he told Mr. Green he had been more physically active – he had been mowing grass, taking walks, and, recently, fishing. All are

solitary pursuits and none are further defined by how long and how often.  In May 2012, Plaintiff *planned* to go to a restaurant – the first social event outside the house referred to in the record.  In August 2012, he testified that he did not mow lawns for other people and, when asked if he had any friends, first said he did not, then said "Maybe a couple."  (R. at 49, 51.) He was not asked if he ever did any activities with friends, whether at home or not.

The ALJ's citation to isolated activities, none of which appear to be done on a routine, sustained basis other than personal grooming, does not support his conclusion that Plaintiff has only mild restrictions in his activities of daily living.  Cf. **Bernard v. Colvin**, 774 F.3d 482, 489 (8th Cir. 2014) (affirming ALJ's finding that claimant had only mild restrictions in his activities of daily living based on evidence that he "could perform a number of activities of daily living on *a sustained useful routine basis*," including mowing the lawn, preparing meals, watching television, grocery shopping, using public transportation, and performing maintenance work at apartment building) (emphasis added); **Brown v. Astrue**, 611 F.3d 941, 955-56 (8th Cir. 2010) (affirming ALJ's finding that claimant with anxiety disorder had only mild restrictions in her activities of daily living when record established that she got her daughter off to school, cleaned, occasionally cooked, went to workout at least a couple of times a week, was involved in her daughter's school activities, visited her mother, went to church almost every Sunday, and occasionally attended Bible class).  The case shall be remanded for reconsideration of the degree of restriction Plaintiff has in his activities of daily

living.[9]  And, because the ALJ declined to give Dr. Kerr's September 2011 statement full weight, in part, because he found it inconsistent with Plaintiff's daily activities, the case shall be remanded for reconsideration of that statement, if necessary, after the ALJ reevaluates Plaintiff's activities.

Also, Plaintiff argues that greater weigh1t should have been given the opinion of Dr. Doyle.

The ALJ failed to recognize that the November 2010 statement was that of Dr. Doyle, Plaintiff's treating physician, and was *not* given after a one-time examination.  Nevertheless, the ALJ did not err in discounting Dr. Doyle's opinion that Plaintiff was currently unable to function.  The opinion was conclusory, see **McDade v. Astrue**, 720 F.3d 994, 999-1000 (8th Cir. 2013) (affirming ALJ's decision to discount treating physician's conclusory, unexplained opinion), and did not clearly employ the definition of disability used by the Act and its regulations, **id.** at 1000.  It was also inconsistent with the objective medical evidence, e.g., normal lumbar spine x-rays taken the same month.  See **Cline v. Colvin**, 771 F.3d 1098, 1103 (8th Cir. 2014) (opinion of treating physician may be discounted when inconsistent with objective medical evidence).  Plaintiff's challenge to the ALJ's assessment of the November 2010 statement is unavailing.

---

[9]In support of the ALJ's assessment of Plaintiff's daily activities, the Commissioner additionally cites his newspaper reading and television watching.  When asked at the hearing if he reads or watches television, Plaintiff replied, "I read – look at newspapers and stuff sometimes." (R. at 41.)  These solitary, occasional pursuits do not reflect routine, sustained activities.

## Conclusion

For the reasons set forth above, the ALJ's decision denying Plaintiff's DIB application is supported by substantial evidence on the record as a whole. His decision denying Plaintiff's SSI application is reversed and remanded for further consideration of the degree of limitation Plaintiff has in his activities of daily living. Although the Court is aware that the ALJ's decision may not change after properly considering those activities, the determination is nevertheless one that the Commissioner must make in the first instance. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED and that this case is REMANDED to the Commissioner for further proceedings as discussed above.

An appropriate Order of Remand shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  24th  day of June, 2015.